# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

A/R ROOFING, L.L.C., et al., )
)
        **Plaintiffs,** )
)
v. )   Case No. 05-1158-WEB
)
CERTAINTEED CORP., et al., )
)
        **Defendants.** )
)
)

## MEMORANDUM AND ORDER

This matter is before the court on North Pacific Group's motions to (1) amend its answer (Doc. 163) and (2) compel discovery (Doc. 169). For the reasons set forth below, both motions shall be GRANTED.

### Background

This action stems from representations concerning the quality of shingles manufactured by CertainTeed and resold by North Pacific Group.[1] The following highly

---

[1] Plaintiffs purchased the shingles from the "Allen Timber Company," the trade name for defendant North Pacific Group, Inc., a distributor of building materials and wood products. With respect to roofing products, North Pacific's web page indicates that the company specializes in the "liquidation of manufacturer's excess inventory with a shingle regrade sorting yard." (www.northpacific.com/dept/southern/so_roofing.html).

summarized facts provide context for the motions and the parties' arguments.

Plaintiffs sell and install roofing materials. In late 2003 they purchased 23 truckloads of "Landmark 30" shingles from North Pacific for roofing projects in central Kansas.[2] They allege that North Pacific represented that the shingles were "#1" and plaintiffs made that same representation to their customers. However, in October 2004, CertainTeed issued a letter stating:

> 23 trucks of CertainTeed Landmark 30, produced at our Birmingham, Alabama plant, were sold to a seconds broker at a discounted price with a reduced warranty. This material was shipped to Rooftop Wholesale / AR Roofing for their use in their sales market. We advised the broker that the close-out shingles would not carry our full warranty and he has verified that he communicated these restrictions to his customer, Rooftop Wholesale. Since the shingles were sold based on the potential for visual impairment (wavy or buckled), we eliminated that coverage from the warranty. This was communicated by a letter to the broker, which he has on file.
>
> We have received many calls from homeowners, distributors, and contractors regarding these visually impaired roofs. They have asked that we take a stance and communicate our position on these shingles in order to avoid any confusion. This bulletin should clear up any concerns regarding these shingles and the warranty available on them.[3]

---

[2] A/R Roofing, L.L.C. and American Standard Roofing, L.L.C. are roofing contractors. Roof Top Wholesale, L.L.C. is a wholesaler of roofing materials. The three companies are located in Pratt, Kansas and are owned by members of the Walker family.

[3] North Pacific admits that: 1) "initially" the shingles had a wavy appearance, 2) the defect was "clearly visible" to North Pacific, 3) the shingles carried a limited warranty, and 4) because of the defect, CertainTeed sold the shingles to North Pacific at a "substantially discounted price." <u>North Pacific's Answer to CertainTeed's Cross Claim</u>, (Doc. 26). Notwithstanding these admissions, North Pacific asserts that it sold only #1 shingles to plaintiffs. <u>Amended Complaint</u>, Ex. B, (Doc. 13).

Plaintiffs contend that their business "declined sharply" after this letter was distributed to customers and competitors.

Based on the letter and their belief that they purchased #1 shingles, plaintiffs make the following claims against CertainTeed: 1) tortious interference with prospective business advantage; 2) tortious interference with existing contracts; and 3) defamation. In the event that CertainTeed's version of events is accurate and the 23 truckloads of shingles were inferior and sold to North Pacific at a deep discount with limited warranties, plaintiffs make the following claims against North Pacific: 1) breach of warranty and 2) fraud or negligent misrepresentation. CertainTeed counterclaims against plaintiffs for defamation and cross-claims against North Pacific for (1) breach of contract, (2) defamation, and (3) indemnification.[4]

## Motion to Amend

North Pacific moves to amend its answer to (1) assert the affirmative defenses of comparative fault, failure to mitigate damages, and estoppel; (2) assert an additional defense to plaintiffs' claim for punitive damages, and (3) clarify certain factual assertions.[5] Plaintiffs

---

[4] The defamation and indemnification cross-claims are based on allegations that North Pacific made intentional misrepresentations to plaintiffs concerning the quality of the shingles and warranty offered by CertainTeed.

[5] Consistent with its motion to add comparative fault as a defense, North Pacific also seeks to modify a provision in the scheduling order indicating that the principles of comparative fault do not apply in this case. (Doc. 24, para. 4(a)).

and CertainTeed oppose the motion, arguing that the motion is untimely and prejudicial. The parties' arguments are addressed in greater detail below.

## Analysis

The standard for permitting a party to amend its answer is well established. Without an opposing party's consent, a party may amend its pleading only by leave of the court. Fed. R. Civ. P. 15(a).[6] Although such leave to amend "shall be freely given when justice so requires," whether to grant leave is within the court's discretion. Panis v. Mission Hills Bank, 60 F.3d 1486, 1494 (10th Cir. 1995)(citing Woolsey v. Marion Labs., Inc., 934 F. 2d 1452, 1462 (10th Cir. 1991)). In exercising its discretion, the court must be "mindful of the spirit of the federal rules of civil procedure to encourage decisions on the merits rather than on mere technicalities." Koch v. Koch Industries, 127 F.R.D. 206, 209 (D. Kan. 1989). The court considers a number of factors in deciding whether to allow an amendment, including untimeliness, prejudice to the other party, bad faith, and futility of amendment. Hom v. Squire, 81 F.3d 969, 973 (10th Cir. 1996).

Plaintiffs and CertainTeed contend that North Pacific's motion is untimely because the scheduling order established a December 30, 2005, deadline for pleading amendments

---

[6] A party may amend its pleading once as a matter of course before a responsive pleading is filed. If the pleading is one to which no responsive pleading is permitted and the matter has not been placed upon the trial calendar, the party may amend within 20 days after the pleading has been served. Fed. R. Civ. P. 15(a). The time for amending "as a matter of course" is long past.

and that North Pacific knew or should have known the facts supporting its motion to amend before the deadline passed. North Pacific counters that depositions taken in February, April, and May of 2006 provided new information which supports the motion to amend; therefore, the motion is timely.

Comparison of the original pleadings in this case with the deposition excerpts provided by North Pacific presents a close question as to whether CertainTeed knew or should have known the facts supporting its amended answer. However, given the preference in federal court that matters be decided on the merits rather than on technicalities, the court concludes that the scales tip in favor of North Pacific's assertion that the depositions provided new evidence. Accordingly, the argument that the motion to amend is untimely is rejected.

Plaintiffs and CertainTeed also argue that allowing North Pacific to amend to add affirmative defenses is highly prejudicial because written discovery has been completed and the majority of the fact witness depositions have been taken. However, neither plaintiffs nor CertainTeed provide any specifics concerning the prospective discovery they might find necessary if the motion is granted. Moreover, although the legal theories in this case are complex, the facts are relatively straightforward and this is a case of "who-said-what."[7] To the extent that additional discovery is necessary, the court will allow plaintiffs and CertainTeed to supplement written discovery to minimize any prejudice. The court will also

---

[7] In addition to determining what statements were made, discovery has been conducted concerning: (1) the actual quality and appearance of the shingles and (2) whether the statements caused any damage.

entertain, on an expedited basis, motions by plaintiffs and CertainTeed to re-depose any fact witnesses and to shift the cost of the additional discovery to North Pacific.

In summary, the preference in federal court is that matters should be resolved on the merits rather than on technicalities. After balancing the relevant factors, the court is persuaded that North Pacific's motion to amend its answer should be granted.

**IT IS THEREFORE ORDERED** that North Pacific's motion to amend its answer **(Doc. 163)** is **GRANTED.** North Pacific shall file and serve its amended answer on or before **October 27, 2006.**

## Motion to Compel

North Pacific moves to compel CertainTeed to supplement its answer to Interrogatory 14 and provide:

> a) the amount of total production of Landmark 30 shingles with this characteristic of a tendency to become more wavy than normal during storage; and b) the amount of those shingles that were sold and installed through CertainTeed's normal dealers/distributors.

CertainTeed argues that the requested information is: (1) not relevant to the issues in this lawsuit and (2) not "readily ascertainable." As explained in greater detail below, neither argument is persuasive.

CertainTeed argues that the "fundamental basis" for its cross-claim is that North Pacific *failed to inform plaintiffs that the shingles were not warranted for their wavy*

*appearance*; therefore, the total number of defective shingles produced and sold by CertainTeed "could not have any possible relevance to any material issue in this case." (Doc. 174, pp.4-5). However, the claims in this case are broader than the narrow formulation articulated by CertainTeed.

> For example, CertainTeed alleges that North Pacific:
>
> 17. ... not only failed to inform purchasers, including the A/R Roofing Parties, that the Landmark 30 shingles were defective in visual appearance and carried only a reduced warranty, but **also intentionally misrepresented the shingles to be "# 1 warranted shingles."**
>
> 18. The term "# 1" is an industry term which has particular meaning. When the term "#1" is used in reference to a roofing shingle, it is understood that those shingles are first quality shingles, carrying the manufacturer's usual complete warranty.

<u>CertainTeed's Answer and Cross-Claim</u>, Doc. 21, p. 18 (emphasis added).[8]  Because North Pacific expressly denies paragraphs 17 and 18, the meaning of the term "# 1" and whether North Pacific intentionally misrepresented the shingles as "# 1" are issues to be resolved in this lawsuit. Evidence that CertainTeed sold a significant volume of shingles with the same "wavy" defect to the public through its normal channels of distribution is arguably indicative that CertainTeed considered the shingles as "# 1" quality; therefore, North Pacific's

---

[8]

Equally important, plaintiffs' claims against CertainTeed and North Pacific center on whether certain representations were made that the shingles were "# 1" and whether in fact the shingles were "# 1" or an inferior quality.

discovery request is relevant.[9]

CertainTeed also argues that the information sought is "not readily ascertainable" and that it "would have to try to identity employees who were present during the production (now approximately 4 years ago) who had knowledge of the defect and who had a basis for estimating how long the problem existed." This argument is unpersuasive because the mere fact that a party must question its employees to prepare an interrogatory answer is not a sufficient basis for refusing to answer an interrogatory.

More importantly, CertainTeed produced an internal document during discovery analyzing "the patterning problem" after the company began receiving complaints concerning the appearance of the shingles.[10] The document explains that the problem arose when CertainTeed changed the shingle length (from an English length to a metric length) without changing the cut-out pattern, causing the tabs to "line up" in the bundles. When the bundles were stacked on pallets, a "wavy" or "lasagna" pattern developed. The solution was to adjust the pattern length and to conduct hourly quality checks. (Doc. 175, Ex. 1). Because the switch from an English length to a metric length created the problem, CertainTeed has

---

[9] Obviously, the relevance and weight of such evidence at trial will be tempered by evidence that CertainTeed was unaware of the problem when the shingles were initially sold and the steps CertainTeed took to correct the problem. However, in the context of discovery, North Pacific is entitled to know how many of the problem shingles were placed into CertainTeed's normal chain of distribution.

[10] Apparently, shingles which developed this "wavy" problem were manufactured at plants located in Ennis, Texas and Birmingham, Alabama. CertainTeed has disclosed cumulative totals for all of its plants but has not provided production figures for the Ennis and Birmingham plants.

a readily ascertainable date from which shingles with the "wavy" problem were produced. Similarly, CertainTeed has a readily ascertainable date when adjustments were implemented to correct the problem. Based on the two dates, CertainTeed can review its production records and provide the information requested. Accordingly, because the information requested is relevant and available, North Pacific's motion shall be granted.

**IT IS THEREFORE ORDERED** that North Pacific's motion to compel a supplemental answer to Interrogatory 14 **(Doc. 169)** is **GRANTED.** CertainTeed shall provide its supplemental answer by **October 27, 2006.**

**IT IS SO ORDERED.**

Dated at Wichita, Kansas this 17th day of October 2006.

S/ Karen M. Humphreys
_____
KAREN M. HUMPHREYS
United States Magistrate Judge